# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LISA M NIQUETTE,

> Plaintiff,

v.                                                    Case No. 20-CV-213

ANDREW M. SAUL,
Commissioner of the Social Security Administration,

> Defendant.

# DECISION AND ORDER

## 1. Introduction

Plaintiff Lisa M. Niquette alleges that she has been disabled since August 31, 2016. (Tr. 26.) She seeks disability insurance benefits and supplemental security income. After her application was denied (Tr. 106-19), a hearing was held before an administrative law judge (ALJ) on September 20, 2018 (Tr. 41). On January 15, 2019, the ALJ issued a written decision concluding that she was not disabled. (Tr. 35.) After the Appeals Council denied Niquette's request for review on December 13, 2019 (Tr. 3-6), she filed this action. All parties have consented to the full jurisdiction of a magistrate judge (ECF Nos. 5, 8), and this matter is ready for resolution.

## 2. ALJ's Decision

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). The ALJ found that Niquette "has not engaged in substantial gainful activity since August 31, 2016." (Tr. 26.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). The ALJ concluded that Niquette has the following severe impairments: "cervical spine degenerative disc disease (DDD), fibromyalgia, bilateral shoulder degenerative joint disease (DJD), chronic fatigue syndrome/narcolepsy, obstructive sleep apnea (OSA), osteoporosis with residual T12 compression fracture, depression, an anxiety disorder, and panic disorder." (Tr. 26.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925. If the impairment or

impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. §§ 404.1509, 416.909, the claimant is disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ found that Niquette "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (Tr. 26.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Niquette has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that [Niquette] can lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently. She can sit, stand and walk 6 of 8 hours, but is unable to climb ladders, ropes and scaffolds, but can occasionally climb ramps and stairs, and occasionally balance, stoop, kneel, crouch and crawl. [Niquette] is limited to occasional bilateral overhead reaching, frequent bilateral handling and fingering. [Niquette] must avoid all exposure to extreme cold and is limited to occasional exposure to vibrations and hazards such as unprotected heights and dangerous moving machinery. [Niquette] is able to understand and remember simple

3

instructions, carry out routine and repetitive tasks. [Niquette] can maintain concentration for two-hour periods.

(Tr. 29-30.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560, 416.920(a)(4)(iv), 416.960. The ALJ concluded that Niquette "is unable to perform any past relevant work." (Tr. 33.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c). At this step, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Niquette] can perform." (Tr. 34.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert (VE), who testified that a hypothetical individual of Niquette's RFC, age, education, and work experience could perform the requirements of office helper, inspector and assembly DOT. (Tr. 34.) After finding Niquette could perform work in the national economy, the ALJ concluded that she was not disabled. (Tr. 35.)

## 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial

4

evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

## 4.  Analysis

Niquette argues that the ALJ erred by (1) failing to adequately account for her moderate limitations in concentration, persistence, or pace; (2) improperly limiting the weight of medical opinions; and (3) failing to properly address her subjective symptoms.

### 4.1.  Concentration, Persistence, or Pace

The ALJ determined that, "[w]ith regard to concentrating, persisting, or maintaining pace, [Niquette] has a moderate limitation." (Tr. 27.) To account for that

5

limitation, he stated that the RFC "restricts [Niquette] to simple, routine, repetitive tasks and is limited to concentration at two-hour increments." (*Id.*) He further stated that "evidence suggests [Niquette] retains adequate concentration and focus to function pursuant to these restrictions as testing performed in October 2016 by neuropsychologist Dr. Johnson revealed an average attention span." (*Id.*) The ALJ also noted that, although treatment notes show difficulty concentrating after she began taking Lyrica, "longitudinal mental status examinations reflect logical, well-organized thoughts with some pre-occupation with doubts and worries." (Tr. 28.) (Internal citations omitted.) He discussed evidence that her concentration improved with CPAP compliance, and she reported activities that require concentration and focus. (*Id.*)

Niquette argues that, although the ALJ found she was moderately limited in concentration, persistence, and pace, this limitation is not adequately accounted for in the RFC. (ECF No. 13 at 12-14.) She argues that "the ALJ provides no explanation as to why or how a restriction to simple, routine, repetitive tasks for two hour increments would account for Plaintiff's limited concentration." (ECF No. 13 at 12-13.) She also argues that concentration limitation to two hour increments is not a true limitation because the vocation expert (VE) testified that all unskilled work includes break schedules which preclude work for longer than two hours. (ECF No. 13 at 13, Tr. 73.)

6

In response, the Commissioner argues that the RFC does address Niquette's moderate limitation and that it was "reasonable to suggest that when [Niquette] was compliant with her CPAP use and slept well, her focus and concentration were adequate." (ECF No. 17 at 6-7.)

It is well-established that "[b]oth the RFC and the hypothetical question presented to a VE must incorporate the 'totality of a claimant's limitations,' including any 'deficiencies of concentration, persistence and pace.'" *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019) (unpublished) (quoting *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)). "The ALJ need not use this exact terminology, so long as the phrasing 'specifically exclude[s] those tasks that someone with the claimant's limitations would be unable to perform.'" (*Id.*) (alteration in original); *see Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) ("Though particular words need not be incanted, we cannot look at the *absence* of the phrase 'moderate difficulties with concentration, persistence, and pace' and feel confident this limitation was properly incorporated in the RFC and in the hypothetical question.") (emphasis in original). "Even generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." *Urbanek v. Saul*, No. 19-1394, 796 F. App'x 910, 914 (7th Cir. 2019) (unpublished).

7

State agency consultant George Starrett, Ed.D., opined that Niquette was moderately limited in her "ability to maintain attention and concentration for extended periods" and in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 130-31.) Treating Psychiatrist Dr. Steven Miljour opined that Niquette was seriously limited in her ability to maintain attention for two hour segments, complete a normal workday or workweek without interruptions from psychologically based symptoms, understand and remember detailed instructions, carry out detailed instructions, and deal with stress of semiskilled and skilled work. (Tr. 863-64.)

"[The Seventh Circuit] [has] repeatedly rejected the notion that a hypothetical like the one here 'confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Varga v. Colvin*, 794 F.3d 809, 814-15 (7th Cir. 2015) (quoting *Yurt*, 758 F.3d at 858-59. Although the RFC includes more limitations than just "simple, routine and repetitive tasks," the additional limitations address Niquette's social functioning and workplace adaptation rather than deficiencies in concentration, persistence, and pace. (*Id.* at 815) ("'Few if any work place changes' with limited 'interaction with coworkers and supervisors' deals largely with workplace adaptation

8

rather than concentration, pace, or persistence."). The ALJ's RFC assessment does not adequately address the limitations found by Niquette's medical providers.

Accordingly, on remand the ALJ shall ensure that Niquette's moderate limitations in concentration, persistence, and pace are incorporated into the RFC assessment.

### 4.2. Opinion Evidence

Niquette also challenges the "little weight" the ALJ afforded the opinions of Steven Miljour, M.D., John Gagnon, MSW, LMSW, Tangerine Dupuis, M.D., and the functional capacity evaluations (FCEs) from 2016 and 2018. (ECF No. 13 at 14-20.) The ALJ found the opinions and FCEs "vague" and discounted them for a variety of reasons, including that they were "inconsistent" and "[do] not specify why [Niquette] is disabled nor [do they] include function by function limitations[.]" (Tr. 28-29.)

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (unpublished) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency

9

and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(c)(2)).

While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010) (unpublished)).

### 4.2.1. Steven Miljour, D.O.

In an undated statement faxed on February 21,2017, Dr. Steven Miljour, Niquette's treating psychiatrist, opined that Niquette has "generalized anxiety disorder [and] major depression, recurrent moderate" and that "both diagnoses affect her to [sic] work. She is unable to work." (Tr. 634.) In an August 7, 2018 statement Dr. Miljour opined Niquette is seriously limited in her abilities to "maintain attention for two hour segment[s]," "complete a normal work day and workweek without interruptions for psychologically based symptoms," "understand and remember detailed instructions," "carry out detailed instructions," and "deal with stress of semiskilled and skilled work." (Tr. 863-64.)

The ALJ gave little weight to Dr. Miljour's opinions because he "admitted [Niquette] improved with medication and his longitudinal mental status examinations indicate [Niquette] is alert, appropriately attired, logical, and demonstrates adequate

10

attention and concentration, memory, and insight[.]" (Tr. 29.) The ALJ also noted "there are inconsistencies within the August 7, 2018 assessment including a reported GAD score range 70-80, which reflects only slight functional limitations and the assessment that [Niquette] would be off task 20-25% of the time secondary to symptoms." (Tr. 29.)

Niquette argues that the ALJ erred by not providing an adequate explanation for discounting Dr. Miljour's opinions. (ECF No. 13 at 16.) She argues that the ALJ failed to properly consider Dr. Miljour's assessment that, while Niquette is capable of a relatively high level of function, she cannot maintain that level of function over a normal workday or workweek. (ECF No. 13 at 16.)

The Commissioner argues that the ALJ reasonably determined that Dr. Miljour's finding of mild symptoms (as reflected in the GAF score) was inconsistent with his finding that she could not perform simple work. (ECF No. 17 at 9-12.) Niquette replies that the Commissioner's arguments either fail to respond to her specific argument or violate *Chenery* by offering different reasoning than that supplied by the ALJ. (ECF No. 18 at 2-3.)

The court finds that the ALJ did not sufficiently explain his reasoning for discounting Dr. Miljour's opinion. Dr. Miljour assessed serious limitations in Niquette's ability to maintain attention and complete a normal workday or workweek without interruptions from symptoms. (Tr. 863.) The ALJ did not address this assessment when

11

he assigned Dr. Miljour's opinion limited weight based on inconsistencies elsewhere in his notes. (Tr. 29.) Accordingly, the ALJ erred in failing to consider Dr. Miljour's assessment of Niquette's ability to maintain her level of function.

### 4.2.2. John Gagnon, MSW, LMSW

In a letter dated January 4, 2017, John Gagnon, LMSW, Niquette's treating therapist, opined that Niquette's "combination of depression and anxiety have impacted her sleep, her energy level, her focus and memory." (Tr. 491.) In the same letter Gagnon notes he "diagnosed [Niquette] with Major Depressive Disorder (recurrent) and Anxiety disorder, not otherwise specified." (Tr. 491.) In an October 31, 2016 progress note, Gagnon wrote, "I do believe that she is significantly disabled." (Tr. 598.)

To support giving "little weight" to Gagnon's opinions, the ALJ stated:

> Little weight is assigned to [the October 2016] assessment as it is vague and does not specify why [Niquette] is disabled nor does it include function by function limitations. Mr. Gagnon opined in January 2017 that [Niquette's] mental impairments impact her ability to sleep, focus, and remember, which affects her ability to work (Exhibit 5f/2). Some weight is assigned to this assessment as [Niquette's] impairments have been assessed as severe causing more than minimal functional limitations. However, as noted [Niquette's] activities of daily living suggest greater functioning including socializing with friends, caring for her grandchildren, cooking, cleaning, and shopping (Exhibits 3E [sic]). Furthermore, the mental status examinations reflect no more than mild anxiety and depression. Further, as noted [Niquette's] conditions remained stable and were often either in partial remission or full remission.

(Tr. 28.)

12

Niquette challenges the "little" weight the ALJ gave to Gagnon's October 2016 opinion and only "some" weight to Gagnon's January 2017 letter. (ECF No. 13 at 17.) Niquette argues that the ALJ did not consider Gagnon's comments on Niquette's memory problems. (ECF No. 13 at 17.) She also argues that, contrary to Gagnon's 2017 letter, mental status examinations did not demonstrate stability or remission until after the date of the letter. (ECF No. 13 at 17.)

The Commissioner argues that the October 2016 letter was a vague, conclusory statement that was not a medical opinion as defined in 20 C.F.R. § 404.1527(a)(2). For Gagnon's other opinions, he argues that the ALJ did consider Niquette's memory problems associated with Lyrica and that "the ALJ reasonably found that other evidence contradicted the extent of the limitation that Mr. Gagnon opined." (ECF No. 17 at 13.) He also argues that Gagnon's statements were "conclusory, and vague, and as the ALJ explained, not consistent with [Niquette's] activities or the stability of her conditions." (ECF No. 17 at 15.)

As a psychotherapist and licensed social worker, Gagnon is not an "acceptable medical source." SSR 06-3p. Having said that, although Gagnon's opinion is not entitled to controlling weight, the ALJ is still required to consider the 20 C.F.R. § 416.927(c) factors in determining how much weight to give his opinions. SSR 06-3p. In fact,

> it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the

13

individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole.

20 C.F.R. § 416.927(f)(1).

The court finds that the ALJ has sufficiently explained his reasoning for discounting Gagnon's opinion. Among other reasons, "the mental status examinations reflect no more than mild anxiety and depression." (Tr. 28.) The ALJ reasonably found these examination findings inconsistent with Gagnon's opinions on the impact of Niquette's mental health on her ability to work. Because the ALJ's reasons for giving Gagnon's opinions some or little weight are not patently erroneous, he did not err.

### 4.2.3. Tangerine Dupuis, M.D.

In a May 31, 2018 medical note Dr. Tangerine Dupuis, Niquette's treating primary physician, stated:

> [Niquette] is smiling, healthy, alert, no distress. Respiratory effort is normal. Speech is clear and thought process is affected by memory loss and decreased comprehension. She would not be able to maintain any type of gainful employment with her memory deficit[.] Affect is friendly but on insightful [sic] [.] Patient does make good eye contact. She is otherwise well-nourished, well hydrated and well groomed[.] Pt is a fair to poor historian.

(Tr. 823.)

Niquette argues that the ALJ "never really addresses this opinion at all but seems to generally criticize the validity of Dr. Dupuis' opinion on the basis that [Niquette] 'requested statements of Dr. Dupuis in August 2016, October 2016, and December 2016

14

indicating she is unable to work secondary to pain.'" (ECF No. 13 at 18.) Niquette argues that the requests for disability statements are not relevant because they were two years prior to the above statement and regarded pain, not memory. (ECF No. 13 at 18.)

The Commissioner argues that the ALJ's failure to discuss Dr. Dupuis's opinion is not a reversible error because the opinion is conclusory and does not suggest functional limitations. (ECF No. 17 at 17.)

Dr. Dupuis's 2018 opinion does address a specific function—memory—when opining that Niquette would be unable to work in a medical note. (Tr. 823.) The ALJ does not address this opinion. It is true, as the Commissioner notes, that Dr. Dupuis's opinion does not contain much support for her conclusion. The ALJ's failure to address Dr. Dupuis's 2018 opinion leaves Niquette to wonder whether he gave any weight to the function-specific opinion of her treating primary care physician. Therefore, the ALJ erred in failing to evaluate what weight to give Dr. Dupuis's medical opinion.

### 4.2.4. Functional Capacity Evaluations

Physical Therapist Damon Hastings, DPT, performed an FCE on Niquette on September 20, 2016. (Tr. 32.) Hastings determined that Niquette was "incapable of sustaining Light level of work for an 8-hour day/40-hour week[]" but that "[i]f allowed to work at the Sedentary level, [Niquette] can tolerate the 8 hour day[]" with "limited sitting tolerance for the Sedentary level of work." (Tr. 356.) The ALJ gave this assessment

"limited weight" because "the findings reflect a significant variation in [Niquette's] physical abilities. The assessment indicates [Niquette] is incapable of light exertional work over an 8-hour period and is also incapable of sedentary exertional work as well, secondary to sitting intolerance." (Tr. 32.)

Niquette argues that that ALJ's only rationale for discounting the FCE finding is conclusory. (ECF No. 13 at 18.) She argues that the 2018 FCE also found Niquette incapable of sustaining light work for an 8-hour day/40-hour week, but the ALJ did not acknowledge this later FCE. (ECF No. 13 at 19.)

The Commissioner responds that the ALJ properly gave the 2016 FCE limited weight because it reflected significant variations in Niquette's abilities. (ECF No. 17 at 17-18.) As for the 2018 FCE, the Commissioner argues that any error in not addressing it was harmless because it "does not differ from the 2016 evaluation." (ECF No. 17 at 18.)

The FCEs are probative because they are based on assessments specifically evaluating Niquette's function by function capacity. The ALJ did not build a logical bridge between his description of the 2016 assessment and his decision to assign it limited weight. The ALJ noted that the FCE "findings reflect a significant variation in [Niquette's] physical abilities." (Tr. 32.) It is not clear what the ALJ meant by "significant variation in physical ability." It could mean that Niquette is able to do some activities but not others, or it could mean that she can do some activities only some of the time. These explanations

16

would be consistent with Niquette's argument that, although she is able to do some things, she is unable to maintain that level of functioning over a normal workday or workweek. (ECF No. 13 at 16.) The "significant variation" within the FCE findings does not necessarily reflect any reason to doubt the soundness of the assessment.

Absent a discussion of the evidence, the court cannot conclude that the ALJ complied with his obligation to build an accurate and logical bridge between the 2016 FCE evidence and his conclusion to give it "little weight." The court will not assume that the ALJ did not address the 2018 FCE due to its similarity to the 2016 FCE. Therefore, on remand the ALJ must clearly articulate the reasons for the weight he gives to both of the FCEs.

### 4.3. Subjective Symptoms

In making his RFC determination the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304 at *3; see also 20 C.F.R. § 404.1529. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to

perform work-related activities...." SSR 16-3p, 2017 WL 5180304 at *3. The ALJ's evaluation of a claimant's symptoms is entitled to "special deference" and will not be overturned unless it is "patently wrong." *Summers*, 864 F.3d at 528 (citing *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)).

The ALJ must also consider, to the extent they are relevant, the following factors:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p.

The ALJ offered the following regarding Niquette's subjective symptoms:

After careful consideration of the evidence, the undersigned finds that [Niquette's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Niquette's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence for the reasons stated in this decision.

(Tr. 30.) The ALJ's reasons for this conclusion were as follows:

18

[Niquette] reported exercising by repeatedly lifting her grandchild overhead (Exhibit 6F/18) and by July 2017, the claimant was walking an hour a day, and reported in October 2017 that she is "fine" as long as she remains "very busy" (Exhibits 13F/9, 14F/30)… [S]he was exercising by using a Fitbit, taking 3000 steps a day with a goal of 4000 steps per day (Exhibit 16F/166). She also reported in March 2018, that she was being paid $10 an hour to care for her 5 grandchildren (Exhibit 16F/l 72)… [Niquette's] activity level suggests the capacity for work activity at the light exertional level.

(Tr. 31.)

Niquette argues that the ALJ's analysis of the SSR 16-3p factors is "patently incorrect" because it "consistently misrepresents this evidence and improperly conflates it with the ability to perform full time competitive employment at the light level." (ECF No. 13 at 20-21.) Specifically, Niquette argues that the ALJ erred in finding that her daily activities "suggest greater functioning." (ECF No. 13 at 21-22.)

In response the Commissioner argues that "the ALJ's assessment was supported by substantial evidence." (ECF No. 17 at 20.) The Commissioner states that the ALJ permissibly found that Niquette's daily activities "required a great deal of exertion… or a great deal of concentration[.]" (ECF No. 17 at 21.)

While an ALJ must consider a claimant's daily activities in evaluating how her symptoms may limit her ability to work, 20 C.F.R. § 404.1529(c)(3)(i), household chores and work activities are not necessarily interchangeable. *See Hughes v. Astrue*, 705 F.3d 276, 278-79 (7th Cir. 2013); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (finding that the

19

ALJ's "casual equating of household work to work in the labor market cannot stand"). The Court of Appeals for the Seventh Circuit has cautioned ALJs against placing undue weight on a claimant's household activities in assessing her ability to hold a job outside the home. *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006).

There initially seems to be an inconsistency between Niquette's stated inability to lift more than eight pounds and her reports of lifting her grandchild above her head. However, the comment about lifting her grandchild overhead is from a medical note dated June 16, 2016, two months before the alleged onset date. (Tr. 510.) The reported activities the ALJ relied on (*e.g.*, caring for grandchildren) are consistent with Niquette's testimony that she experiences "'debilitating' pain" and "chronic fatigue." (Tr. 30.) In stating that Niquette's ability to do household chores "suggests the capacity for work activity at the light exertional level[,]" the ALJ erred by failing to explain how Niquette's ability to perform certain daily activities suggested her ability to work full time. (Tr. 31.)

Niquette also argues that the ALJ asserts she did not comply with her prescriptions. (ECF No. 13 at 22-23.) Niquette asserts that the exhibits relied upon by the ALJ are either from before the alleged onset date or merely list her prescriptions. (ECF No. 13 at 23.) The Commissioner responds that one of the records the ALJ cited was from the alleged onset date, August 31, 2016. (ECF No. 17 at 22.) However, the treatment note is dated June 31, 2016, two months before the alleged onset date. (Tr. 513.) The exhibits

20

the ALJ cites do not support a finding of non-compliance with prescription medications. (Tr. 32.) The ALJ erred in citing noncompliance with prescriptions when considering Niquette's subjective symptoms.

Niquette further argues that, although her condition is described as "stable," that does not indicate at which level of functioning it stabilized and how she maintained that stability. (ECF No. 13 at 23.) The Commissioner responds that the ALJ "was entitled to consider [evidence that Niquette's conditions stabilized] as one factor when finding [she] was not as limited as alleged." (ECF No. 17 at 22.)

Throughout his opinion the ALJ noted that Niquette's mental impairments and fibromyalgia were assessed as "stable". (Tr. 27, 28, 31, 33.) A stable or even improving condition is not indicative of an ability to work full-time. *Herron v. Colvin*, No. 14-CV-56, 2014 U.S. Dist. LEXIS 161947, at *18 (E.D. Wis. Nov. 19, 2014). "A person's symptoms might improve from severe to moderate and yet still be disabling. Improvement alone does not suggest the absence of a disability." *Id.* Pain and other symptoms do not need to get progressively worse or even vary for them to be disabling. The ALJ erred when he implied that Niquette's mental impairments and fibromyalgia were not as limiting as she alleged because they were stable.

Finally, Niquette argues that the ALJ failed to confront evidence that she attempted, and failed, to work part time. (ECF No. 13 at 23-24.) She argues that this is

21

further evidence that she is unable to work full time at a light level. The Commissioner responds that the ALJ is "not required 'to address every piece of evidence or testimony in the record.'" (ECF No. 17 at 22) (*quoting Cole v. Barryhill,* No. 17-CV-1366, 2018 WL 4386099, at *5 (E.D. Wis. Sept. 14, 2018).

Although the ALJ does not need to confront every piece of evidence in the record, he is not free to ignore entire arguments. The ALJ erred when he failed to address the argument that Niquette's failed attempts to work part-time show that she cannot work full-time.

The ALJ committed errors of law when he equated household chores to work in the labor market, incorrectly stated there were records of noncompliance with prescription medication, improperly implied that her mental impairments and fibromyalgia were not as limiting as she alleged because they were stable, and failed to confront evidence of Niquette's part time work attempts. In sum, the ALJ largely erred when he determined that Niquette's subjective statements concerning the intensity, persistence, and limiting effects of her symptoms were not consistent with the record. On remand, the ALJ shall reevaluate the intensity, persistence, and limiting effects of Weyland's symptoms.

22

**5. Conclusion**

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of December, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge